**In re: GRAND JURY INVESTIGATION**

No. 03–123–09.

United States District Court,
E.D. Pennsylvania.

Redacted Version as Unsealed
Aug. 8, 2006.

## ORDER

DAVIS, District Judge.

AND NOW, this 8th day of August 2006, upon consideration of the government's motion to unseal and to publish the Court's May 16, 2006 Opinion, and upon the absence of any objection by the target witnesses to the government's motion, it is hereby ORDERED that the government's motion is GRANTED to the extent that the government seeks to unseal and to publish a slightly redacted version of the May 16, 2006 Opinion. It is hereby further ORDERED that this redacted version of the May 16, 2006 Opinion, attached as Exhibit A to this Order, is unsealed and that the government may publish this document.

## Exhibit A

### *MEMORANDUM OPINION*

Presently before the Court is the government's motion to disqualify a law firm (the "Law Firm") from representing seven grand jury witnesses in the above-referenced grand jury investigation and the Law Firm's response thereto. For the following reasons, this Court grants the government's motion.

## I. Factual and Procedural History

The instant grand jury is investigating, *inter alia*, allegations of fraud, obstruction of justice, and conspiracy to obstruct justice on the part of a public official and several members of his staff.[1] The Law Firm was retained to represent seven different witnesses in the grand jury investigation (the "clients"). Two clients, identi-

fied as A.A., a former employee of the legislative committee chaired by the public official (the "legislative committee"), and B.B., executive director of the legislative department that provides computer services to the public official, are potential targets of the grand jury investigation ("target clients"). (*See* A.A. and B.B. Aff., attached as Ex. 3–4 to Law Firm Br.; Gov. Mot., at ¶ 3).[2] The remaining five clients, identified as C.C., D.D., E.E., F.F., and G.G., are fact witnesses ("non-target clients"). (*See* Gov. Mot., at ¶ 3). D.D., E.E., F.F., and G.G. are employees of the legislative committee. (*See* D.D., E.E., F.F., and G.G. Aff., attached as Ex. 6–9 to Law Firm Br.). C.C. is not a state employee; instead, she is the wife of D.D. and a former worker on the public official's private farm. (*See* C.C. Aff., attached as Ex. 10 to Law Firm Br.; Transcript of May 8, 2006 Hearing ("Tr."), at 94).

The clients were referred to the Law Firm by the public official's attorney and by chief counsel of the legislative committee, at the behest of the public official's attorney. (*See* Tr., at 46–48, 56–57, 104–106). The legislative committee is also paying the Law Firm's legal fees for A.A., B.B., F.F., D.D., E.E., and G.G. (*See* Service Purchase Contract, Retention Letter, and Vouchers, attached as Ex. A to Gov. Br.; Tr., at 54, 58, 66–67, 77–78, 107, 109). C.C. has no contract for legal services with the Law Firm, but continues to receive services without a corresponding bill; C.C. and the Law Firm have had no discussions as to the source of the payment of her legal fees. (*See* Tr., at 96–99).

---

**1.** Pursuant to Local Rule of Criminal Procedure 6(c)(3), the Court uses pseudonyms to protect the anonymity of the parties.

**2.** According to the government, A.A. also faces fraud charges for his submission of al-

legedly fraudulent invoices to a non-profit organization and for his appropriation of funds from this same non-profit organization to subsidize a bar review course. (*See* Tr., at 12; February 9, 2006 Letter).

The seven clients were subpoenaed by the grand jury at various times. Prior to the appearance of A.A. and B.B. before the grand jury, the government expressed interest in discussing a possible immunity agreement with each target client. (*See* Gov. Mot., at ¶¶ 5–10; February 9, 2006 Letter, attached as Ex. C to Gov. Br.; April 18, 2006 Letter, attached as Ex. D to Gov. Br.). The government explained that it would be interested in immunizing one of the two target clients, but probably not both. (*See* Gov. Mot., at ¶ 7; Tr., at 6). The government also explained the Law Firm's conflict of interest in representing both A.A. and B.B., asserting that the two target clients possessed directly opposing interests. (*See* January 26, 2006 Letter, attached as Ex. B to Gov. Br.; February 9, 2006 Letter, attached as Ex. C to Gov. Br.; April 18, 2006 Letter, attached as Ex. D to Gov. Br.).

The Law Firm refused to negotiate with the government for immunity on behalf of A.A. or B.B., let alone to participate in an initial off-the-record proffer among counsel. (*See* February 9, 2006 Letter; April 18, 2006 Letter). Instead, the Law Firm insisted on blind immunity, which would require the government to offer immunity prior to knowledge of the content of the testimony of A.A. and B.B., and advised its target clients not to engage in an off-the-record proffer to determine immunity eligibility. (*Id.;* Gov. Mot., at ¶ 8). On February 7, 2006, A.A. appeared before the grand jury and asserted his Fifth Amendment privilege against self-incrimination. (*See* Gov. Mot., at ¶ 5). On April 25, 2006, B.B. also responded to the government's questions before the grand jury by asserting her Fifth Amendment privilege against self-incrimination. (*See* Gov. Mot., at ¶ 11). The government represents that it is likely to charge and to indict both A.A. and B.B. in the absence of immunity. (*See* Tr., at 6, 8, 11–12, 24–25).

The Law Firm found no risk of exposure to criminal charges for its five non-target clients. (*See* Law Firm Br., at 1). The Law Firm advised these non-target clients to participate in an off-the-record proffer with the government. (*See* Law Firm Br., at 1; E.E. Aff., at ¶¶ 6–8; G.G. Aff., at ¶¶ 5–8; F.F. Aff., at ¶¶ 5–8; D.D. Aff., at ¶¶ 5–9; C.C. Aff., at ¶¶ 5–8). The non-target clients executed an off-the-record proffer letter, and testified before the grand jury. (*Id.*). According to the government, G.G.'s testimony on April 18, 2006 implicated B.B. in the crime of conspiracy to obstruct justice. (*See* Gov. Mot., at ¶ 9).

On Friday, April 28, 2006, the government filed a motion seeking disqualification of the Law Firm from representing each of the seven clients. The Law Firm filed a response on May 5, 2006. The Law Firm's response includes affidavits from the seven clients proclaiming the absence of a conflict of interest and agreeing to waive such a conflict, to the extent one exists. The Court held a hearing on May 8, 2006, at which all seven clients appeared and testified.

## II. Discussion

The government seeks to disqualify the Law Firm from representing the target and non-target clients. (*See* Proposed Order, attached to Gov. Br.).

 A court has supervisory authority to regulate the professional conduct of lawyers during federal grand jury proceedings, including the power to disqualify an attorney, or law firm, from representing more than one witness in certain circumstances. (*See* Law Firm Br., at 15); *United States v. Miller,* 624 F.2d 1198, 1201 (3d Cir.1980) ("district court's power to disqualify an attorney derives from its

inherent authority to supervise the professional conduct of attorneys appearing before it"); *In re Gopman,* 531 F.2d 262, 266 (5th Cir.1976) (district court has authority to disqualify attorney from multiple representation in grand jury context pursuant to supervisory powers over ethical standards). In order to determine whether disqualification is appropriate, the court must perform a three part inquiry: (1) whether an actual conflict, or the serious potential for an actual conflict, exists; (2) whether the conflict, if one exists, has been properly waived; and (3) if a conflict exists and if the conflict has not been properly waived, whether disqualification is the appropriate remedy. *See In re Investigative Grand Jury Proceedings on April 10, 1979 and Continuing,* 480 F.Supp. 162, 168 (N.D.Ohio 1979); *In re Grand Jury,* 446 F.Supp. 1132 (N.D.Tex.1978); *In re Grand Jury Investigation,* 436 F.Supp. 818 (W.D.Pa.1977). Throughout this analysis, a court must be mindful of the competing interests underlying the sanction of disqualification, including a party's right to counsel of his choosing,[3] a party's right to conflict-free representation, the court's interest in maintaining the efficacy of the grand jury process, the sanctity of the attorney-client relationship, and the necessity of ensuring compliance with the highest standards of professional ethics. *See, e.g., United States v. Moscony,* 927 F.2d 742, 749–750 (3d Cir.1991) (discussing concerns relevant to resolution of whether to disqualify counsel over alleged conflict);

*European Cmty. v. RJR Nabisco,* 134 F.Supp.2d 297, 303 (E.D.N.Y.2001).

### A. Conflict

The government argues that the Law Firm's representation of the seven grand jury witnesses is burdened by a litany of actual and potential conflicts. (*See* Gov. Br., at 6–15).

### 1. Standard

■ The Supreme Court has declared that a presumption in favor of a criminal defendant's choice of counsel at trial dissipates "not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." *Wheat v. United States,* 486 U.S. 153, 163, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). This standard-an actual conflict or a serious potential for an actual conflict-has been applied to lawyers representing multiple witnesses in grand jury proceedings both prior to and after the *Wheat* decision. *See, e.g., In re Grand Jury Proceedings,* 859 F.2d 1021, 1024 (1st Cir.1988) (government must make showing of actual conflict or serious potential for conflict to disqualify counsel from representing multiple witnesses before grand jury); *In re Special February 1977 Grand Jury,* 581 F.2d 1262, 1265 (7th Cir.1978) (disqualification motion may be granted upon showing of actual conflict or grave danger of actual conflict which would impede functioning of grand jury); *In re Grand Jury Empaneled January 21, 1975,* 536 F.2d 1009, 1012 (3d Cir.1976) (reaching

---

**3.** Although the source of this right remains obscure, particularly because it does not appear that Sixth Amendment protections attach during grand jury proceedings, courts addressing motions to disqualify attorneys from representing multiple grand jury witnesses are uniform in expressly acknowledging, or in presupposing without discussion, the existence of this right. *See, e.g., In re Investigation Before the February, 1977, Lynchburg*

*Grand Jury,* 563 F.2d 652, 658 (4th Cir.1977) (noting "entitlement" of witnesses to representation by attorney in grand jury proceedings, whether grounded in federal procedural law or constitutional right); Beale, Grand Jury Law and Practice § 6:26 (2nd ed.2005). Nor does the government argue that a grand jury witness lacks a right to counsel of her choosing during grand jury proceedings.

458

question of validity of waiver of potential conflict of interest in representation of multiple witnesses before grand jury, thereby implying that potential conflict may require disqualification). Not surprisingly, the government bears a "heavy burden" in proving that this standard is met due to the ramifications of finding a conflict of interest. *See, e.g., United States v. Diozzi*, 807 F.2d 10, 12 (1st Cir. 1986); *Rohm and Haas Co. v. American Cyanamid Co.*, 187 F.Supp.2d 221, 226–227 (D.N.J.2001).

█ Conflicts of interest "arise whenever an attorney's loyalties are divided." *Moscony*, 927 F.2d at 750. The representation of multiple clients in a single proceeding increases the likelihood of both actual and potential conflicts. *See Wheat*, 486 U.S. at 164, 108 S.Ct. 1692 (noting that "multiple representation of criminal defendants engenders special dangers of which a court must be aware"). In determining the existence of an actual conflict or of a serious potential for an actual conflict,[4] courts often look in part to the relevant body of professional rules. *See, e.g., Miller*, 624 F.2d at 1201 (court should disqualify attorney when it determines, based upon factual circumstances, that disqualification is appropriate means to enforce applicable disciplinary rule); *Cohen v. Oasin*, 844 F.Supp. 1065, 1066–1067 (E.D.Pa. 1994). The Local Rules of Criminal and Civil Procedure for the Eastern District of Pennsylvania require attorneys practicing in the district to comply with the Pennsylvania Rules of Professional Conduct. *See* Local R.Crim. P. 1.2 (Rule 83.6 of Local Civil Rules applicable to criminal proceed-

ings); Local R. Civ. P. 83.6 ("Rules of Professional Conduct adopted by this Court are the Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania"); *Clark Capital Mgt. Group v. Annuity Inv. Life Ins. Co.*, 149 F.Supp.2d 193, 196 (E.D.Pa.2001) (applying Pennsylvania Rules of Professional Conduct to resolve motion for disqualification due to conflict). Accordingly, although disqualification need not be predicated upon the violation of any specific rule, the Pennsylvania Rules of Professional Conduct provide a useful template against which to measure the conduct of lawyers subject to a disqualification motion. *See, e.g., United States v. Voigt*, 89 F.3d 1050, 1076 n. 12 (3d Cir.1996) (district court's responsibility to ensure fair and proper administration of justice permits disqualification without finding of violation of specific rule of professional conduct); *Moscony*, 927 F.2d at 751 (affirming disqualification of law firm for violation of Rule 1.6 of Pennsylvania Rules of Professional Conduct); *United States v. Stout*, 723 F.Supp. 297, 303 (E.D.Pa.1989) (affirming disqualification of law firm for violation of Rules 1.7, 1.9, and 3.7 of Pennsylvania Rules of Professional Conduct).

## 2. Application

█ It is clear not only that the Law Firm is operating under an actual conflict of interest in its representation of the seven grand jury witnesses, but also that an array of potential conflicts pose a further danger to the effectiveness of the representation. There are several layers to this conflict.

---

4. An actual conflict exists in this context when the multiple representation strains the performance of the law firm's professional obligations to one or more clients. *See, e.g., In re Grand Jury*, 446 F.Supp. at 1135. On the other hand, a potential conflict is more speculative; this conflict exists when the multiple representation may in the future generate a tension in the law firm's professional duties to its clients. *Id.*

First, rather than representing only target witnesses or only non-target witnesses, the Law Firm's representation includes both target and non-target witnesses in the grand jury investigation. *See* Sara Beale, Grand Jury Law and Practice § 6:29 (2005) (noting that "[s]ome courts find an actual conflict exists if an attorney represents both a target and nontarget witness"). Through the divergent legal positioning of the target witnesses and the non-target witnesses, the Law Firm has entered a web of ethical quandaries from which neither attorney nor client can escape unharmed. *See In re Investigative Grand Jury Proceedings on April 10, 1979 and Continuing*, 480 F.Supp. at 168 (joint representation of targets and non-targets before grand jury constitutes conflict of interest warranting remedial judicial action); *In re Investigating Grand Jury of Philadelphia County No. 88–00–3503*, 527 Pa. 432, 593 A.2d 402, 409–410 (1991) (affirming disqualification of lawyer who represents target and non-target witnesses with "potentially conflicting interests" in grand jury investigation). For instance, after determining that G.G., a non-target client, was not subject to criminal exposure, the Law Firm advised G.G. to cooperate with the government, provide an off-the-record proffer, and testify before the grand jury. (*See* G.G. Aff., attached as Ex. 7 to Law Firm Br., at ¶¶ 3–11). This testimony allegedly incriminated B.B. (*See* Gov. Mot., at ¶ 3). Thus, by recommending that G.G. cooperate with the government, the Law Firm breached its ethical obligation of loyalty to prevent the disclosure of adverse testimony against B.B.. *See* 204 Pa.Code § 81.4 (Rule 1.7(a)(1)) (conflict of interest exists if "representation of one client will be directly adverse to another client"); *In re Investigative Grand Jury Proceedings on April 10, 1979 and Continuing*, 480 F.Supp. at 166–167

(finding actual conflict in representation of target and non-target clients because law firm's "duty to represent the targets zealously may, and in all likelihood does, compel them to seek to prevent the disclosure to the grand jury of information injurious to the targets"). On the other hand, if the Law Firm would have advised against cooperation, thereby subjecting G.G. to contempt charges, the firm would have breached its ethical duty of loyalty to G.G. *Id.; see also In re Grand Jury Proceedings*, 428 F.Supp. 273, 277 (E.D.Mich.1976) (representation of target and non-target clients, who may possess information detrimental to target clients, generates conflicting loyalties that may adversely impact professional recommendations). This ethical quagmire is emblematic of the conflicting duties which challenge the objectivity of legal advice offered in the course of a law firm's multiple representation of target and non-target grand jury witnesses. *See, e.g., In re Investigative Grand Jury Proceedings on April 10, 1979 and Continuing*, 480 F.Supp. at 166–168 (outlining ethical challenges facing lawyers representing target and non-target witnesses before grand jury).

Second, the Law Firm's representation of the two target clients has actualized into a direct and immediate conflict by virtue of the government's communication to the Law Firm of its desire to provide immunity to one (but not both) of these targets, following an off-the-record proffer. (*See* Tr., at 6–7, 24–25); *In re Grand Jury Empaneled January 21, 1975*, 536 F.2d at 1012–1013 (suggesting that actual conflict exists with respect to attorney's multiple representation of· grand jury witnesses when government seeks to discuss immunity with one of these witnesses); *In re Grand Jury Investigation*, 436 F.Supp. at 822 (actual conflict exists when lawyer represents multiple grand jury witnesses and

when "government communicates to the attorney that it desires to offer immunity to any of his clients"). This places the interests of B.B. and A.A. in an antagonistic relationship. It also situates the Law Firm in the untenable position of recommending a course of action that will work to the detriment of one of the target clients; indeed, advising B.B. to discuss immunity with the government may result in the loss of immunity to A.A., and vice-versa. *See* 204 Pa.Code § 81.4 (Rule 1.7(a)(1)). Furthermore, if either B.B. or A.A. engages in immunity discussions with the government, a serious potential exists that he or she will then provide testimonial evidence that leads, however directly or indirectly, to the indictment of the non-immunized target client.[5] *Id.; In re Grand Jury Investigation*, 436 F.Supp. at 822 ("[i]t requires but a statement of the obvious to realize that negotiations for a promise of non-prosecution cannot properly be conducted by attorneys who also represent those people who may well be hurt by testimony resulting from such a promise"). More importantly, the Law Firm's advice to date, refusing to have either target client engage in discussions concerning the possibility of immunity, has materially harmed the interests of B.B. and A.A.; both face, perhaps *needlessly*, the realistic prospect of indictment. *Id.* (Rule 1.7(a)(2)) (concurrent conflict exists if "significant risk that the representation

of one or more clients will be materially limited by the lawyer's responsibility to another client"). Consequently, regardless of the legal soundness of the Law Firm's strategy to avoid immunity discussions with the government in the absence of blanket immunity, the fact remains that the Law Firm's advice to each target client is not free from conflict; it is constrained by the Law Firm's fidelity to the other target client. *See* Beale, Grand Jury Law and Practice § 6:29 (2005) (noting that lawyer representing multiple grand jury witnesses may be prevented from exploring with prosecutors immunity as to one witness due to ethical obligations to other witnesses).

Third, the intensity of the Law Firm's actual conflict in its joint representation of target and non-target clients is further heightened by the financial dynamics of the joint representation. The seven grand jury clients did not independently select the Law Firm. Instead, the Law Firm was pre-selected for them by the attorney to the public official who is the central focus of the grand jury proceedings. (*See* Tr., at 46–48, 56–58, 65, 77–78, 104–106). In addition, the Law Firm's legal bills are paid by the legislative committee that the public official chairs. (*See* Service Purchase Contract and Engagement Letter, attached as Ex. A to Gov. Br.; Tr., at 54, 58, 66–67, 77–78, 96–99, 107, 109). This includes the legal fees for

---

5. Although the Law Firm contends that neither B.B. nor A.A. possess knowledge of the other's direct participation in a conspiracy to obstruct justice, this contention does not negate the antithetical positioning of their legal interests. Nor does it mean that the testimony of either B.B. or A.A. before the grand jury would not help prove the crime of conspiracy to obstruct justice against the other, particularly because the government can establish a conspiracy without either party's direct awareness of the other party's actions. (*See*

Gov. Br., at 8). A.A., for instance, may provide testimony about his own actions and those of others (not including B.B.) in furtherance of the conspiracy, thereby indirectly assisting the government in its prosecution of B.B., who may be linked to the conspiracy through independent evidence. (*Id.*). In fact, the government represents that it has enough evidence at this juncture to charge both B.B. and A.A. for conspiracy to obstruct justice. (*See* Tr., at 10).

the representation of A.A. and presumably the legal fees for the representation of C.C., neither of whom are employees of the legislative committee or the legislature itself. (*See* Tr., at 94, 96–99; A.A. Aff., attached as Ex. 4 to Law Firm Br.). The structure of this financial arrangement therefore imparts a desire, however subconsciously embedded, to protect (from indictment) the public official who pays the clients' legal fees. *See, e.g., Pirillo v. Takiff,* 462 Pa. 511, 341 A.2d 896, 904 (1975) (finding conflict requiring disqualification when legal fees of attorney representing multiple grand jury targets are paid by entity with interests hostile to government cooperation). It is this possibility of subtle allegiance to the public official that challenges not only the purity of the Law Firm's current advice to the target clients, including its recommendation to avoid immunity discussions with the government and its minimization of the impact of an indictment, what the Law Firm describes as "not the end of the world," [6] but also the independence of any future advice to the non-target clients. *See* 204 Pa.Code § 81.4 (Rule 1.8(f)) (lawyer shall not accept compensation for representation from one other than client unless client gives informed consent, there is no interference with lawyer's independence of professional judgment, and information relating to representation is protected as required by Rule 1.6); *id.* (Rule 1.7, comment 13) (conflict of interest exists if acceptance of payment from source other than client presents "significant risk that the lawyer's representation of the client will be materially limited by the lawyer's own interest in accommodating the lawyer's fees").

■ Finally, the effectiveness of the Law Firm's representation of multiple clients is hindered by a number of potential conflicts that are likely to ripen into actual conflicts in the near future, absent judicial intervention. For instance, the Law Firm's duty of zealous advocacy would require the Law Firm, to the extent it has not done so already, to utilize confidential communications acquired through its representation of non-target clients to formulate a strategy for the representation of the target clients during the remainder of the grand jury investigation; this disclosure would constitute a violation of the Law Firm's duty of confidentiality to the non-target clients. *See* 204 Pa. Code § 81.4 (Rule 1.6(a)) (lawyers shall not reveal information relating to representation of client absent informed consent and other narrowly circumscribed exceptions). Furthermore, if an indictment is delivered against even one of the target clients, the non-target clients may be called as trial witnesses to testify against the indicted target witness; this would trigger the ethical proscription against cross-examining former clients. *See, e.g., Moscony,* 927 F.2d at 750 ("attorney who cross-examines former clients inherently encounters divided loyalties"). The Law Firm would also be in a position to use confidences gained through its previous representation of the non-target clients to the benefit of the target clients and to the detriment of the non-target clients. *Id.* (disqualification appropriate when lawyers would cross-examine former clients at trial and could use information obtained through previous representation of former clients during grand jury proceedings);

---

6. The Law Firm used this description, which marginalizes the consequences of an indictment, to argue the non-existence of an actual conflict, indeed, to justify the independence of its legal advice to its target clients to refrain from immunity discussions, despite the government's expectation to indict both target clients in the absence of such discussions. (*See* Tr., at 25).

*see also Voigt,* 89 F.3d at 1078–1079 (affirming disqualification of counsel from representing defendant at criminal trial when counsel previously represented target witnesses and institutional entity during grand jury process because "strong possibility" exists that defense counsel would cross-examine former clients at trial and could use client confidences from prior grand jury representation against former clients). Although the Law Firm has expressed an intention to withdraw upon the maturation of these potential conflicts, this promise does not undermine the gravity of the potential dilemma or the possible prejudice to the Law Firm's clients for the loss of counsel prior to trial. *See* 204 Pa.Code § 81.4 (Rule 1.6(d)) (duty not to reveal information relating to representation of client continues after termination of attorney-client relationship); *In re Investigation Before the February, 1977, Lynchburg Grand Jury,* 563 F.2d at 656 (court has duty to take early action during grand jury proceedings to avoid conflict of interest problems).

### B. Waiver

This Court has characterized the concurrent conflict as both actual and potential. The Court must now determine whether this conflict can be waived, and, if so, whether this Court should accept the waivers of conflict-free counsel tendered by the target and non-target clients.

### 1. Availability of Waiver for Actual Conflicts in Representation of Grand Jury Witnesses

The Third Circuit has not formally declared whether a waiver of an actual conflict is effective in the grand jury context. *See, e.g., In re Matter of Grand Jury Empaneled January 21, 1975,* 536 F.2d at 1012 (permitting waiver of potential con-

flict and not reaching question of waivability of actual conflict in grand jury context). Some courts hold that a waiver of an actual conflict is *per se* invalid in the grand jury context, reasoning that an individual may not waive external, countervailing interests of an institutional nature, such as the right of the public to an effective grand jury system. *See, e.g., In re Investigative Grand Jury Proceedings on April 10, 1979 and Continuing,* 480 F.Supp. at 170 (suggesting that waiver approach does not apply to grand jury proceedings because individual not entitled to waive public's right to effective grand jury process and to pursue stonewalling technique); *In re Grand Jury,* 446 F.Supp. 1132, 1139 (N.D.Tex. 1978); *In re Grand Jury Proceedings,* 428 F.Supp. at 277–278 (refusing to permit waiver of conflict in representation of multiple grand jury witnesses because clients may not waive "right of the public to an effective functioning grand jury investigation"). Other courts have declared that a waiver of conflict-free counsel is permissible under certain circumstances; these courts privilege a client's right to her choice of counsel, conflict-free or not, during grand jury proceedings. *See, e.g., In re Taylor,* 567 F.2d 1183, 1192 (2nd Cir. 1977) (court must accept client's knowing and intelligent waiver despite existence of actual conflict of interest); *In re Grand Jury Investigation,* 436 F.Supp. at 821–822 (agreeing that individual may waive right to conflict-free counsel in grand jury proceeding, but finding that waiver under circumstances would be illusory).

This Court refuses to adopt a *per se* rule prohibiting clients from waiving conflicts of interest in the grand jury context. *See In re Grand Jury Investigation,* 436 F.Supp. at 822 n. 14 ("discomfort to the Grand Jury process, without more, is not sufficient to vitiate an individual's important right to counsel of his own choos-

ing"). Conversely, the Court finds that a client may effectively waive her right to conflict-free representation during the grand jury investigation so long as the waiver complies with federal standards and the court chooses to accept the waiver. It is in this analysis of the validity and acceptance of the waiver that institutional and other public interests, such as the integrity of the grand jury process, must be considered. *See, e.g., Wheat,* 486 U.S. at 161–163, 108 S.Ct. 1692 (noting that trial court has discretion not to accept waiver of actual conflict and that court may consider structural and institutional interests in determining whether to accept waiver); *United States v. Dolan,* 570 F.2d 1177, 1184 (3d Cir.1978) (court may decline to accept waiver of actual conflict when joint representation violates ethical standard); *United States v. Stansfield,* 874 F.Supp. 640, 643 (M.D.Pa.1995).

## 2. Validity of Waivers

An individual may waive her right to conflict-free representation. *See Moscony,* 927 F.2d at 749. An individual waives this right when it is made voluntarily, knowingly, intelligently, and "with sufficient awareness of the relevant circumstances and the likely consequences." *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). This requires the trial judge to be satisfied that "the defendant is aware of the foreseeable prejudices his attorney's continued representation could entail for his trial, and possible detrimental consequences of those prejudices." *United States v. Dolan,* 570 F.2d 1177, 1181 (3d Cir.1978).

A court need not accept a client's waiver of her right to conflict-free representation. *See Moscony,* 927 F.2d at 749 ("trial court has an institutional interest in protecting the truth-seeking function of the proceedings over which it is presiding by considering whether the defendant has effective assistance of counsel, regardless of any proffered waiver"). As the Supreme Court has expressed this power, a district court "must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict." *Wheat,* 486 U.S. at 163, 108 S.Ct. 1692. The refusal to accept a waiver of conflict-free representation must be consistent with the purposes behind this power, including the maintenance of the integrity of the relevant proceedings, insulating the trial judge from future attacks over the adequacy of the waiver, discouraging ethical breaches, and protecting the candor essential to the attorney-client relationship. *Id.; Moscony,* 927 F.2d at 749; *United States v. Lebed,* 2005 WL 1971877, at *4 (E.D.Pa. Aug.12, 2005).

### a. Target Clients

The Court finds that the waivers of A.A. and B.B. fail to meet the knowing, voluntary, and intelligent standard. Several reasons support this conclusion. First, the Court finds that the target clients are unable to appreciate the circumstances behind, and the intensity and imminence of, the conflict of interest, as demonstrated by their affidavits and by their disagreement with the Court as to the existence of an actual conflict. (*See* B.B. Aff., attached as Ex. 3 to Law Firm Br., at ¶¶ 12–13; A.A. Aff., attached as Ex. 4 to the Law Firm Br.; Tr., at 44–45, 61). Second, the Court finds that the target witnesses are unable to recognize the gravity of the consequences of the conflict; indeed, if A.A. and B.B. continue to follow the Law Firm's conflict-riddled advice and continue to reject immunity discussions

with the government, both client targets may be *unnecessarily* indicted. (*See* Tr., at 42–43, 51, 53, 59–61). Third, based upon the cursory conclusions in their affidavits and upon their testimony during the May 8, 2006 hearing,[7] it does not appear that A.A. and B.B. were advised by the Law Firm of the actual conflict of interest or the effect of this actual conflict on the integrity of the representation, thereby negating the possibility of informed consent. *See* 204 Pa.Code § 81.4 (Rules 1.6, 1.7, and 1.8) (permitting waiver of conflicts upon informed consent); *In re Investigation Before the February, 1977, Lynchburg Grand Jury*, 563 F.2d at 657–658 (rejecting waiver of conflict of interest by target and non-target grand jury witnesses subject to multiple representation arrangement because no evidence that attorney explained to each client precise nature of actual, rather than potential, conflict and consequences of this conflict, including possible use of confidential facts to sacrifice one client's best interest in order to perform duty to other clients). Fourth, the Court finds that the target clients' desire to continue the representation, as expressed during the May 8, 2006 hearing, is not an expression of independent decision-making, but, instead, a product of the their reliance upon the Law Firm's misrepresentation that no conflict exists, that the Law Firm continues to act in each target client's best interest, and that an indictment is not "the end of the world." (*See* Tr., at 51); *see In re Grand Jury Investigation*, 436 F.Supp. at 821 (finding waiver of actual conflict illusory in part because

lawyers advised grand jury witness that conflict did not exist, thereby defeating voluntary and knowing aspect of relinquishment of right). Fifth, the target clients' waivers may stem from their hesitancy to alienate, if not inculpate, the prime target of the investigation, the public official who chairs the legislative committee for which B.B. currently works and for which A.A. worked until Mach 2005; indeed, the public official's attorney recommended the Law Firm to the target clients, and the public official's legislative committee subsidizes the legal bills of A.A. and B.B.. (*See* Tr., at 46–47, 56–57) *see, e.g., In re Grand Jury Investigation*, 436 F.Supp. at 821 (finding grand jury witness' waiver of actual conflict illusory in part because witness' immediate employer is prospective defendant, as waiver "is likely a function in large part of one's natural hesitance to alienate their employer rather than a product of a free and unrestrained will"); *Pirillo*, 341 A.2d at 904 (affirming disqualification of attorney representing twelve police officers subpoenaed to testify in grand jury proceedings on police corruption because attorneys' fees paid by Fraternal Order of Police, which maintained policy of non-cooperation with government).

Assuming *arguendo* that the waivers of A.A. and B.B. were made knowingly, intelligently, and voluntarily, the Court refuses to accept these waivers due to institutional concerns. Simply put, the Court finds that the Law Firm cannot effectively represent both A.A. and B.B. during the grand jury proceedings, in part because of the govern-

---

7. For instance, each target witness' affidavit denies the existence of an actual conflict and then states, in conclusory fashion, that if such a conflict exists, the target witness waives this conflict. (*See* A.A. Aff.; B.B. Aff., at ¶¶ 12–13). No mention is made of a comprehensive discussion, at the time of the commencement of the representation, of the negative influence of this actual conflict on the Law Firm's capacity to represent each target's best interests, including the particular ethical dilemmas posed by this actual conflict and its practical consequences. (*Id.*).

ment's desire to offer immunity to only one of these target clients. This ineffectiveness places the best interests of these target clients in serious jeopardy, and, on a more symbolic level, attacks the sanctity of the attorney-client relationship. *See, e.g., Voigt,* 89 F.3d at 1079 (affirming district court's rejection of waiver in part because of administration of justice concerns). In addition, the Law Firm's conflicted advice to A.A. and B.B. not to discuss the possibility of immunity with the government has impaired—and will continue to impair—the functioning of the grand jury investigative process and its goal of gathering facts and uncovering whether probable cause exists as to the criminality of certain activities. *See, e.g., Dolan,* 570 F.2d at 1182 (noting that representation of multiple clients is particularly troublesome in grand jury proceedings because it can obstruct government from obtaining cooperation of one member of group of witnesses, thereby defeating grand jury function of ferreting out criminal activities); *In re Grand Jury Proceedings,* 428 F.Supp. at 278 (rejecting waiver of actual conflict because "public has an overriding interest to see that the grand jury investigation in this matter be allowed to uncover the truth free of any potential obstructions arising from a conflict of interest in multiple representation").

### b. Non–Target Clients

The Court also finds that the waivers of the non-target clients do not meet the knowing, voluntary, and intelligent standard. Again, several reasons support this conclusion. First, several of the non-target clients were unable to artic-

ulate an accurate understanding of what a waiver is, despite signing the affidavits purporting to waive their rights. (*See* Tr., at 90–91). Second, each of the non-target clients testified during the May 8, 2006 hearing that they only discussed conflict considerations within the last week or two, after the government filed the instant motion, rather than at the commencement of the representation. (*See* Tr., at 72, 74, 83, 89, 91, 103). Third, it is apparent that the non-target clients lack an appreciation of the foreseeable and unforeseeable issues that could manifest through the representation of seven individuals in distinctly different postures. Indeed, many of the non-target clients based their wish to continue with the Law Firm's representation on the "likeability" of its lawyers, rather than on a thoughtful analysis of the Law Firm's capacity to provide quality legal assistance in light of the dynamics and consequences of the various types of conflicts inherent in the Law Firm's representation of target and non-target clients. (Tr., at 68, 76–77, 84, 95, 104). Finally, the Court expresses doubt as to the voluntariness of the non-target clients' waivers of conflict-free representation: D.D., E.E., F.F., and G.G. may be acquiescing to what they presume to be the desires both of their employer, the legislative committee paying their legal fees, and of the public official whose attorney hand-selected the Law Firm; C.C.'s waiver is likely a product of her desire to continue to receive free legal services from the Law Firm for no apparent reason. (*See* Tr., at 98–99, 106–107, 120).[8]

Assuming *arguendo* that the waivers of C.C., D.D., E.E., F.F., and G.G. were made knowingly, intelligently, and voluntarily, institutional concerns preclude this

---

8. It does not appear that C.C. was informed by the Law Firm as to who is paying for her legal fees, thereby negating the possibility of informed consent. (*See* Tr., at 99); *see* 204

Pa.Code § 81.4 (Rule 1.8(e)) (lawyer may not accept payment of client's legal fees from third party unless, *inter alia,* client gives informed consent).

 

Court from accepting these waivers. The objectivity and neutrality of the Law Firm's current advice to each non-target client are limited by the Law Firm's ethical duties to the target clients, by the Law Firm's representation of the other non-target clients, and by the fee arrangement. *See* 204 Pa.Code § 81.4 (Rules 1.6, 1.7, and 1.8); *In re Investigative Grand Jury Proceedings on April 10, 1979 and Continuing*, 480 F.Supp. at 165–168. Future legal recommendations and litigation strategy may also be constrained by these factors, particularly if an indictment is delivered against one or both target clients. *Id.* To preserve the integrity of the attorney-client relationship, to safeguard the interests of the non-target clients, and to promote the effective administration of justice during the remainder of the grand jury proceedings and a future criminal trial, the Court refuses to accept the waiver of each non-target client. *See, e.g., Wheat*, 486 U.S. at 160–164, 108 S.Ct. 1692; *United States v. Borgesi*, 2000 WL 1511747, at *3 (E.D.Pa. Oct.12, 2000) (refusing to accept waiver of potential conflict that may burgeon into actual conflict during progression of trial).

### C. Remedy

 Disqualification is generally a measure of "last resort." *See, e.g., In re Grand Jury Proceedings*, 859 F.2d at 1026; *United States v. Castellano*, 610 F.Supp. 1137, 1151 (S.D.N.Y.1985); *In re Investigative Grand Jury Proceedings On April 10, 1979 and Continuing*, 480 F.Supp. at 168–171 (evaluating feasibility of less drastic remedies prior to ordering disqualification of attorney representing target and non-target clients before grand jury). Nonetheless, the circumstances behind the Law Firm's multiple representation mandate such a drastic remedy. In-

deed, the Court finds that the Law Firm's representation of the target and non-target clients has been so conflicted that the Law Firm can no longer offer independent, objective legal advice to each client with respect to the ongoing grand jury investigation. *See, e.g., Papanicolaou v. Chase Manhattan Bank*, 720 F.Supp. 1080, 1083 (S.D.N.Y.1989) (finding that disqualification is appropriate when lawyer's conduct "might taint" proceedings); *see also c.f.* 42 PA. Cons.Stat. Ann. § 4549(c)(4) (court may order separate representation of grand jury witnesses when multiple representation arrangement "will or is likely to ... adversely affect" interest of one witness). Immediate disqualification will also preempt the litany of foreseeable and unforeseeable ethical issues that will ripen into actual conflicts at the conclusion of the grand jury proceedings. *See, e.g., Wheat*, 486 U.S. at 162–163, 108 S.Ct. 1692 (court has power to reject waiver and disqualify attorney for potential conflict because "likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict"); *In re Gopman*, 531 F.2d at 266 (affirming disqualification of attorney representing multiple grand jury witnesses in effort "to nip any potential conflict of interest in the bud") (internal citations omitted). Finally, the Court notes that neither party has suggested an outcome short of disqualification in the event of a judicial finding of a conflict of interest and a rejection of the clients' waivers.

In summary, the Court disqualifies the Law Firm from representing each of the seven grand jury witnesses, both targets and non-targets. An appropriate Order follows.

### ORDER

AND NOW, this 16th day of May 2006, upon consideration of the government's motion to disqualify the Law Firm from

representing seven grand jury witnesses in the above-referenced grand jury investigation and of the Law Firm's response thereto, it is hereby ORDERED as follows:

1. The government's motion is GRANTED.

2. The Law Firm is disqualified from representing the seven grand jury witnesses identified in the government's brief and in the body of the attached opinion as A.A., B.B., C.C., D.D., E.E., F.F., and G.G..

3. A.A. and B.B. shall each obtain independent counsel to represent their individual interests.

4. If A.A., B.B., C.C., D.D., E.E., F.F., and G.G. are unable to afford an attorney, the Court shall appoint an attorney upon written request.

5. The Law Firm shall furnish a copy of this memorandum opinion to A.A., B.B., C.C., D.D., E.E., F.F., and G.G..